IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

FILED BY _____ D.C.

05 SEP -6  AM 8: 05

THOMAS M. GOULD
CLERK, U.S. DISTRICT COURT
W.D. OF TN JACKSON

ABLE CARTAGE, INC.,                )
                                    )
        Plaintiff,                  )
                                    )
VS.                                 )          No.  1:04-1039-T-An
                                    )
STRATEGIC OUTSOURCING, INC.,        )
                                    )
        Defendant.                  )

---

ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
AND
GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

Plaintiff, Able Cartage, Inc. ("Able"), filed a complaint in a Tennessee state court

against Defendant, Strategic Outsourcing, Inc. ("SOI"), alleging that SOI had breached a

contract wherein SOI promised to secure workers' compensation coverage for workers that

SOI assigned to Able.  Able sought declaratory and injunctive relief and/or damages in the

amount of $250,000.  Based on 28 U.S.C. §§ 1332 and 1441, SOI then removed Able's

lawsuit to this court.[1]  The parties have now filed cross-motions for summary judgment.  For

---

[1]The procedural history of this case is actually far more convoluted.  Its genesis is an
automobile accident involving a man not a party to this suit.  That man then filed a Tennessee
workers' compensation claim in state court against, among others, Able and SOI.  Able filed a
cross-claim against SOI in the workers' compensation action, but Able subsequently dismissed
the cross-claim voluntarily and re-filed it in a separate Tennessee proceeding.  Before Able re-
filed its contract action, however, SOI had already filed a duplicative action in a North Carolina
state court.  Since that time, Able has removed the proceedings in North Carolina to the United
States District Court for the Western District of North Carolina, Charlotte Division, and SOI has

This document entered on the docket sheet in compliance
with Rule 58 and/or 79 (a) FRCP on __09-00-05__

47

the following reasons, Able's Motion for Summary Judgment is DENIED and SOl'S Motion

for Summary Judgment is GRANTED.

1.

In this case, two business entities dispute which one of them, if either, must pay an

injured Tennessee worker's claim for compensation under the Tennessee Workers'

Compensation Law, TENN. CODE ANN. §§ 50-6-101, et. seq. Able asserts that under a 1999

agreement entered into between it and SOI, and under Tennessee's statutory scheme

governing workers' compensation, SOI is obligated to pay for the worker's injury.  SOI

responds that the 1999 agreement had been terminated, and that, on the date of the

compensable accident, it had no other contractual obligations with respect to individuals

performing services on Able's behalf.  SOI further responds that this court does not need to

address Able's statutory claim and that, even if the court does address it, Able is liable.

The relevant facts are as follows.  Able is or was an incorporated trucking business

having its principal offices in the State of Tennessee.  (Compl. at ¶ 1).  SOI is a North

Carolina corporation operating principally out of offices in Charlotte, North Carolina.  In

April of 1999, Able and SOI entered into a signed "Service Agreement" ("1999

Agreement") whereby SOI promised that it would, among other things and under certain

conditions, assign workers to perform services on Able's behalf and secure workers'

---

removed the Tennessee proceedings to this court.

compensation insurance for those workers while the 1999 Agreement was in effect. (See Able's Mot. for Summ. J., Ex. 1 (1999 Agreement at ¶¶ 2, 6)).

The 1999 Agreement provided that it would automatically renew one (1) year from its effective date, and every year thereafter, unless it was "terminated." (1999 Agreement at ¶ 3). Section 3 further prescribed the manner in which either party to the contract could "terminate" it. (1999 Agreement at ¶ 3).[2] Specifically, the 1999 Agreement stated that,

> [This contract may be terminated by either party by] providing thirty (30) days prior written notice to the other party; provided, however, upon any breach or event of default of this Service Agreement . . ., the [non-breaching] party may [immediately] terminate this Service Agreement . . . upon written notice to the breaching party.

(1999 Agreement, ¶ 3). Notice would be effective "when received." (1999 Agreement at ¶¶ 3, 27). The term "event of default" encompassed SOI's future determination, in SOI's "sole discretion," that Able had suffered a "*material adverse change in financial condition,* such that it hinder[ed] [Able's] ability to meet any or all obligations, and[or] . . . responsibilities of this agreement." (1999 Agreement at ¶ 29.6) (emphasis added). The consequences of termination, of course, included the rescission of SOI's contractual obligation[3] to maintain workers' compensation coverage for workers assigned to Able.

---

[2]During the course of this litigation, Able has often cited section 21 of the 1999 Agreement, which required that a "fully executed written agreement of the parties" be made before the agreement could be "amended." (See, e.g., Able's Mem. Supp. Mot. for Summ. J. at 7). The court does not consider that provision to have any pertinence to the issue presented (whether the 1999 Agreement "terminated"), other than to distinguish an "amendment" from a "termination." See Webster's New Collegiate Dictionary 36, 1194 (8th ed. 1981).

[3]The rescission, by itself, of SOI's contractual obligations under its agreement with Able could not have legally altered any statutory obligations SOI may have had under the Tennessee

3

(1999 Agreement at ¶ 30.1). That consequence would be triggered, as would termination of the contract itself, when Able received written notice. (1999 Agreement at ¶¶ 30.1, 27).

The parties do not dispute that the 1999 Agreement governed their business relationship until at least January 11 of 2002. On that date, Able representative Dewayne McHaffey received a written letter from SOI. (Able's Resp. to SOI's Statement of Undisputed Facts at ¶ 5; SOI's Statement of Undisputed Material Facts at ¶ 5). The letter informed Able in part that "[c]hanges in the law and other market factors require that we have a *new* agreement." (Able's Mot. for Summ. J., Ex. 2 ("the McHaffey letter") (emphasis added). This new agreement came attached to the McHaffey letter. (Able's Statement of Undisputed Facts at ¶ 5; Able's Mot. for Summ. J., Ex. 3). The McHaffey letter requested that its recipient obtain an authorized Able representative's signature on the proposed agreement and return the agreement to SOI. (McHaffey letter). However, the McHaffey letter stated that Able's "*acceptance* of the *terms* of the new agreement" would occur upon Able's submission of payroll records for periods falling on or after March 1, 2002. (Able's Resp. to SOI's Statement of Undisputed Facts at ¶ 6; McHaffey letter). Able's representatives read the McHaffey letter. (Able's Resp. to SOI's Statement of Undisputed Facts at ¶ 8). They also read the proposed new agreement ("2002 Agreement"). (Sanders

---

Workers' Compensation Law, which provides in part that, "[n]o contract or agreement, written or implied, . . . or other device, shall in any manner operate to relieve any employer, in whole or in part, of any obligation created by this chapter except as herein provided." TENN. CODE ANN. § 50-6-114(a) (2004 Supp.). In other words, even though this court finds that SOI has no *contractual* obligation to Able, the injured worker may later argue that SOI nonetheless has an "obligation created by" the Tennessee Workers' Compensation Law.

Dep. at 58). Able continued to submit payroll records to SOI after March 1, 2002, and Able began paying the service rates that SOI charged under the 2002 Agreement. (Able's Resp. to SOI's Statement of Undisputed Facts at ¶ 9). The 2002 Agreement was neither signed nor returned. (McHaffey Aff. at 9).

The 2002 Agreement contained some important changes. Of primary importance for purposes of this dispute, the 2002 Agreement included a provision providing for a method of termination different from the method of termination described in the 1999 Agreement. (Compare 1999 Agreement at ¶¶ 3, 27, 30 with 2002 Agreement at ¶ 4(b)). The 2002 Agreement retained the "material adverse change in . . . condition" (no longer requiring that the condition be "financial") definition of default and again allowed SOI to ascertain the existence of a default in SOI's sole discretion. (2002 Agreement at ¶ 4(b)). However, the 2002 Agreement completely eliminated the requirement that SOI provide Able *any* notice in the event of a material adverse change constituting default. (2002 Agreement at ¶ 4(b)). Instead, if SOI decided to exercise its rights of termination under this provision, the 2002 Agreement allowed retroactive termination to the latest date on which Able was not suffering from a "material adverse change." (2002 Agreement at ¶ 4(b)).

On November 5, 2002, Ronnie Fultz ("Fultz") suffered serious injuries while driving a freight truck at the direction of Able's President. (Sanders Aff. at ¶ 13). Fultz had previously been assigned to Able by SOI pursuant to either the 1999 or 2002 Agreement. (SOI's Resp. to Able's Statement of Undisputed Facts at ¶ 10). SOI subsequently

determined that, on or before the date of Fultz's accident, Able was suffering from a "material adverse change in its condition."[4] (Able's Mot. for Summ. J., Ex. 4 (Termination letter)). Consequently, the 2002 Termination letter informed Able that SOI was exercising whatever termination rights SOI had under the 2002 Agreement—in particular, the right to terminate the agreement retroactively as of the last date that SOI determined Able was not suffering from a material change. (Termination letter). SOI concluded that the 2002 Agreement had terminated on November 2, 2002, three (3) days prior to Fultz's accident. (Termination letter). Therefore, SOI denied any contractual liability for Fultz's workers' compensation claim. Able, for its part, admits that it was suffering from a material adverse change in its condition prior to Fultz's accident. (Able's Resp. to SOI's Statement of Undisputed Material Facts at ¶ 17). It continues to maintain, on the other hand, that SOI is both contractually and statutorily bound to provide any workers' compensation benefits that Fultz may be entitled to under Tennessee law.

Before the court are the parties' cross-motions for summary judgment. Their respective positions are relatively simple. Able first asserts that the 1999 Agreement was

---

[4]Able began to wind down its operations in the fall of 2002. (Able's Statement of Undisputed Facts at ¶ 12). In mid-October, Able's President notified Able drivers, including those assigned by SOI, that Able would be "going out of business" on November 2, 2002. (Able's Resp. to SOI's Statement of Undisputed Material Facts at ¶ 12). Indeed, by November 2, Able had reduced its workforce from twenty-six (26) to five (5). (Able's Resp. to SOI's Statement of Undisputed Material Facts at ¶¶ 13, 14).

SOI became aware of Able's condition as a result of its investigation into Fultz's accident. (Hicks Dep. at 9–12). SOI attempted to contact Able, but SOI was informed that Able was no longer operating as such. SOI then sent a letter of retroactive termination to Able. It did, however, voluntarily provide financial assistance to Fultz until January 30, 2003.

never properly terminated, and that the 2002 Agreement is not an enforceable contract because it lacked a valid acceptance. Therefore, Able continues, SOI's attempt to retroactively cancel its coverage obligations was invalid because the 1999 Agreement mandated that Able receive notice no later than the date of termination (here November 2, 2002). Alternatively, or additionally, Able argues that the Tennessee Workers' Compensation Law requires SOI to cover Fultz's claim because SOI is the relevant "employer." SOI's motion contends that the 2002 Agreement was a valid, enforceable contract, and that its provisions, not the 1999 Agreement, governed the parties' affairs after Able began submitting payroll records for periods falling on or after March 1, 2002. Because the court previously ordered it to address Able's workers' compensation issue, (see Order of July 8, 2005), SOI now also claims that it has no state statutory duties to fulfill.[5]

## II.

The standards governing this court's disposition of a motion for summary judgment are well-settled. Rule 56 of the Federal Rules of Civil Procedure authorizes summary

---

[5]SOI also argues that Able has no standing to raise the workers' compensation issue against SOI because (1) the right to benefits belongs to Fultz and (2) the Tennessee Workers' Compensation Law does not provide a "private right of action" allowing Able to sue SOI. Both of these arguments misstate Able's position and are without merit. First, Able's first theory is not asserting Fultz's benefits but is instead asserting Able's own rights under the 1999 agreement. Second, Able has never purported to state a "private right of action" under Tennessee's Workers' Compensation Law. Rather, it has merely asked the court to interpret and to declare the obligations of the parties under that law, albeit in Able's favor. In short, standing is not the issue.

judgment when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The initial burden is on the moving party to inform the court why the pleadings, discovery materials, and affidavits, if any, "demonstrate the absence of a genuine issue of material fact." Celotex Corp. v.Catrett, 477 U.S. 317, 323 (1986). " 'A fact is material if its resolution will affect the outcome of the lawsuit.'" Martingale, L.L.C. v. City of Louisville, 361 F.3d 297, 301 (6th Cir. 2004) (quoting Daughenbaugh v. City of Tiffin, 150 F.3d 594, 597 (6th Cir. 1998) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986))).

When and if this initial burden is satisfied, the burden then shifts to the opposing party to present evidence that raises a genuine factual dispute for trial. FED. R. CIV. P. 56(e). A dispute as to a material fact is "genuine" only if the court finds that " 'reasonable jurors could find by a preponderance of the evidence that the [party disputing that fact] is entitled to a verdict.'" NILAC Int'l Mktg. Group v. Ameritech Servs., 362 F.3d 354, 357 (6th Cir. 2004) (quoting Anderson, 477 U.S. at 252)). Thus, it is not enough for the non-movant to simply rest on the allegations of the complaint. FED. R. CIV. P. 56(e).

The district court's duty at this stage is "not to weigh the evidence, judge credibility, or in any way determine the truth of the matter." Anderson, 477 U.S. at 249. The relevant inquiry is instead confined to determining whether "the evidence presents a sufficient

disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251–52. That evidence is viewed in the light most favorable to the non-moving party. See, e.g., AutoZone, Inc. v. Tandy Corp., No. 01-6571, 2004 U.S.App. LEXIS 13334, at *13 (6th Cir. June 29, 2004). Stated another way, a doubt as to the presence of a genuine issue for trial will be resolved against the moving party. Adickes v. S. H. Kress & Co., 398 U.S. 144, 158-59 (1970).

Guided by these familiar standards, the court will now separately consider the motions of the parties.

### III. Able's Motion for Summary Judgment

#### A.

Able's first argument is that SOI breached the 1999 agreement, which Able believes was in effect on the date of Fultz's accident. If Able is correct, the Termination letter would be invalid because it was not received by Able until after Fultz's accident. Were this case to proceed to trial, Able would bear the burden of proving, in the first instance, that the 1999 Agreement was a valid and enforceable contract and that it controlled the parties' legal relationship when the accident occurred. SOI does not dispute that it was a party to the 1999 Agreement or that the 1999 Agreement was a valid and enforceable contract at the time that it was entered into. (SOI's Resp. to Able's Statement of Undisputed Facts at ¶ 3). SOI instead defends on the basis of the McHaffey letter.

9

The 2002 McHaffey letter provides, in relevant part,

> A *new* service agreement . . . is enclosed for your immediate signature. [Several
> factors] *require* that we have a *new* agreement.

(Termination letter) (emphases added).  The letter then discusses the many factors, such as

"the rising cost of doing business," that forced SOI to send the letter.  (McHaffey letter).  It

is undisputed that Able representatives received and read the McHaffey letter, (Able's Resp.

to SOI's Statement of Undisputed Facts at ¶ 5; SOI's Statement of Undisputed Material

Facts at ¶ 5), though they claim that they failed to understand it and that they never

"accepted" it.[6]  SOI, on the other hand, contends that, by sending the McHaffey letter, it was

merely exercising its contractual *right* to terminate so as provided in section 4(a) of the 1999

Agreement ("Either party may terminate this Agreement by giving the other at least 30 days

---

[6]In addition to suggesting that the Termination letter sought to "amend or modify" the
1999 Agreement, Able also attempts to characterize the letter as an offer of "novation." (Able's
Mem. Supp. Mot. for Summ. J. at 8.  However, a novation occurs when parties to an existing
obligation *release* each other from a duty and *substitute* a new obligation.  E.g. Whittaker
General Medical Corp. v. Daniel, 374 S.E.2d 268 (N.C. Ct. App. 1988).  Here, SOI does not
claim that it was "released" from its obligations under the 1999 Agreement.  Rather, SOI claims
that it was *exercising* the 1999 Agreement's provisions relating to termination.  In other words,
there was no need for a novation of the 1999 Agreement before the parties entered another
contract, because the 1999 Agreement itself provided that it could be terminated by advance
written notice.  That provision, moreover, is logical in light of the agreement's provision that it
would renew automatically on an annual basis "unless terminated."  In sum, the court is of the
view that the parties were not required to comply with the common law rules of "novation" in
order to effectuate the unambiguous termination clause in the 1999 Agreement.

advance written notice."). (SOI's Resp. to Able's Statement of Undisputed Facts at ¶ 9).

Able attempts to characterize the Termination letter as an attempt to "amend" or to "modify" the 1999 Agreement, and/or as an offer of "novation." (Able's Mem. Supp. Summ. J.). Even if these assertions had merit, they would not entitle Able to summary judgment. For SOI has certainly raised a genuine factual dispute as to whether the 1999 Agreement even governed on the date of Fultz's injury. Viewing the evidence, including the McHaffey letter, in either party's favor, the letter operated to terminate the 1999 Agreement thirty (30) days after its receipt. Thus, one of the essential elements of Able's breach of contract claim (a contract) is absent. Thus, Able is not entitled to summary judgment on the claim that the 1999 Agreement existed when Fultz was injured or that it was breached when SOI denied coverage.

### B.

Able next contends that it is entitled to summary judgment on the ground that it never accepted the terms of the 2002 Agreement. Specifically, Able claims that it understood the McHaffey letter to be in essence two separate offers—an offer to enter into an entire new agreement and an offer to charge higher rates under the old one. (Able's Mem. Supp. Mot. for Summ. J. at 9; McHaffey Aff. at 2). Because the letter was ambiguous to Able, the argument goes, no acceptance of the 2002 Agreement occurred. Without an acceptance, there was no 2002 Agreement.[7]

---

[7]It is puzzling how, if true, the absence of *any* agreement would help Able in this case. Yet, in light of the court's view of the McHaffey letter, that would be the result if Able's mutual

11

"A party to a contract should not be able to say he gave a different meaning to words which are not ambiguous." <u>Higgins v. Higgins</u>, 364 S.E.2d 426, 429 (N.C. 1988). Moreover, the fact that one party may have attached a different subjective intent to a contract (or, in this case, a letter) does not somehow make the contract (or letter) ambiguous or prevent the formation of a contract. <u>Vestal v. Vestal</u>, 271 S.E.2d 306, 310 (N.C. Ct. App. 1980).

The parties' "meeting of the minds" in this case is evidenced, not by what Able thought, but by the plain language of the McHaffey letter, as well as by the parties' conduct on and after March 1, 2002. Contrary to Able's assertion, the letter did not give Able any choice whatsoever as to the continuation of the 1999 Agreement. ("Changes in the law and other market factors *require* that we have a new agreement."). Irrespective of whether or not Able decided to accept the 2002 Agreement, the 1999 Agreement was finished thirty (30) days from receipt of the McHaffey letter. Second, the letter did not state that Able could pick and choose which parts of the 2002 Agreement it wanted to accept or that Able had any discretion as to the manner of acceptance. ("When you submit payroll to us . . . on or after March 1, 2002, doing so will constitute your acceptance of the *terms* (plural) of the new agreement."). Finally, it is undisputed that Able submitted payroll records and paid the new rates (as called for under the 2002 Agreement) on or after March 1, 2002. (Able's Resp. to SOI's Req. for Admis. at ¶ 2).

---

assent theory prevails.

Based on the evidence, Able has not demonstrated that it is entitled to judgment as a matter of law on SOI's claim that the 2002 Agreement governed the parties' relationship on the date in question.

C.

Able's last effort seeks a declaratory judgment as to the proper meaning of the Tennessee Workers' Compensation Law. In particular, Able asks this court to declare that SOI is the responsible "employer" and, as such, must pay Fultz's claim for benefits. However, the court respectfully declines to engage in that controversy.

Section 2201 of Title 28 of the United States Code provides that,

> In a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, *may* declare the rights and other legal relations of any interested party seeking such declaration . . . [and] any such declaration shall have the force and effect of a final judgment or decree.

28 U.S.C. § 2201 (emphasis added). As the statute suggests, this court has a degree of discretion when entertaining a complaint for declaratory judgment. Id.; see also e.g., Quackenbush v. Allstate Ins. Co., 517 U.S. 706, 718 (1996) (citations omitted); Green v. Mansour, 474 U.S. 64, 72–73 (1985); Pub. Serv. Comm'n v. Wycoff Co., 344 U.S. 237, 243–47 (1952).

Here, Able seeks a declaration that SOI was Fultz's "employer" for purposes of determining who pays Fultz's workers' compensation claim. If this court were to grant Able the requested relief, the court's judgment would certainly not preclude Fultz from taking an

13

alternative or inconsistent position in his state court proceeding. The judgment would serve little purpose, other than to give the parties, and perhaps the state court, the court's opinion on the merits of Fultz's workers' compensation claim as against either Able or SOI. That claim could not have been commenced in this court in the first place. See 28 U.S.C. § 1445.

In short, the court believes that it is proper in this case to exercise its discretion not to decide the parties' obligations under the Tennessee Workers' Compensation Law. The determination of which of the parties to this case, if either, was Fultz's "employer" should be adjudicated in his workers' compensation action, not in this federal declaratory judgment action.

## IV. SOI's Motion for Summary Judgment

The court declines to offer its opinion to SOI as to whether or not Able is the responsible "employer," for the same reasons that the court refused to opine in Able's favor. See supra at III.C.[8] The court will, however, consider SOI's claim that it is entitled to summary judgment on its claim that it has no *contractual* duty to Able to pay for Fultz's workers' compensation claim.

SOI argues that there is no genuine dispute that Able did not in fact manifest its assent to the 2002 Agreement. In its effort to establish a triable issue, Able responds that

---

[8]The court notes that SOI initially agreed that this court should only decide the contractual issues between SOI and Able and leave the workers' compensation issues to the state court. Only after an order of this court requiring further briefing did SOI venture into workers' compensation issues and, even then, did so reluctantly.

the 1999 Agreement never terminated and that it never assented to the 2002 Agreement. However, Able has failed to raise a genuine dispute as to either issue.

First, Able's contention that the McHaffey letter did not terminate the 1999 Agreement is not supported by the record. Able admits receiving and reading the letter. (Able's Resp. to SOI's Statement of Undisputed Facts at ¶¶ 5, 8). Able also admits submitting payroll records after the cut-off date. (Sanders Dep. at 59). Able simply claims that it understood the letter as an offer of "novation" or as an attempt to "modify" or to "amend" the 1999 Agreement. The 1999 Agreement itself contradicts Able's argument. That contract contains separate provisions relating to termination, on one hand, and amendment or modification, on the other. (1999 Agreement, ¶¶ 3, 21, 27). When SOI sent the McHaffey letter, it was obviously not proceeding under the "merger" clause in the 1999 Agreement. (McHaffey letter) ("[We] require . . . a *new* agreement" because of legal and market-based factors, etc.). Even interpreting the letter in Able's favor, if that is possible, the letter was emphatically clear that SOI was disavowing the 1999 Agreement.

The court finds, as a matter of law, that the McHaffey letter terminated the 1999 Agreement. <u>See also</u> <u>supra</u> III.A.

SOI finally requests summary judgment on the ground that Able assented to the 2002 Agreement and that SOI thereafter retroactively terminated the agreement as of November 2, 2002. Able responds that a genuine issue exists as to whether or not it accepted the new

agreement.[9] The court finds Able's dispute not genuine. The McHaffey letter provides that the "terms" of the 2002 Agreement would be accepted by submitting payroll records for periods on or after March 1, 2002. (McHaffey Letter). The letter does not give Able the option to accept part of the 2002 Agreement and retain part of the 1999 Agreement. It simply cancels the 1999 Agreement and gives Able the option to either accept or reject the 2002 Agreement, in its entirety. It is undisputed that Able did exactly what the letter specified as the manner of acceptance. Regardless of Able's subjective intent, it manifested its assent to the 2002 Agreement by reading it, by submitting payroll records, and by paying the new rates in accordance with the McHaffey letter.

The court finds, as a matter of law, that Able accepted the 2002 Agreement. See also supra III.B.

V.

Able does not dispute that it was suffering from a "material change in its condition" before the date of Fultz's injury. (Able's Resp. to SOI's Statement of Undisputed Facts at ¶ 17). In light of the court's determination that the 2002 Agreement governed, then, SOI had the right to retroactively terminate its contractual obligation as of the latest date on which SOI determined that Able was not suffering from a material adverse change. Because

---

[9]Even if the court were to somehow find that Able had not assented to the 2002 Agreement, the court's view that the 1999 Agreement had terminated would still leave Able without any contractual claim against SOI arising out of either of the contracts involved here.

the relevant termination date was before the accident, SOI no longer has any contractual duty to Able to secure and maintain workers' compensation coverage for Fultz.

VI.

For the foregoing reasons, Able's Motion for Summary Judgment is DENIED and SOI's Motion for Summary Judgment is GRANTED.

IT IS SO ORDERED.


_____
JAMES D. TODD
UNITED STATES DISTRICT JUDGE

_____
DATE

17

UNITED STATES DISTRICT COURT - WESTERN DISTRICT OF TENNESSEE



# Notice of Distribution

This notice confirms a copy of the document docketed as number 47 in case 1:04-CV-01039 was distributed by fax, mail, or direct printing on September 6, 2005 to the parties listed.

---

Thomas I. Carlton
CORNELIUS & COLLINS
511 Union Street
Ste. 1500
Nashville, TN 37219--069

Blakely D. Matthews
CORNELIUS & COLLINS, LLP
511 Union St., Ste. 1500
P.O. Box 190695
Nashville, TN 37219--069

William B. Mauldin
PENTECOST GLENN & RUDD, PLLC
106 Stonebridge Blvd.
Jackson, TN 38305

Donald D. Glenn
PENTECOST GLENN & RUDD, PLLC
106 Stonebridge Blvd.
Jackson, TN 38305

Ben M. Rose
CORNELIUS & COLLINS
511 Union Street
Ste. 1500
Nashville, TN 37219--069

Honorable James Todd
US DISTRICT COURT